NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0513n.06
Filed: July 19, 2007

Case No. 06-3083

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALPHA DIALLO, *et al.,* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| ALBERTO R. GONZALES, Attorney | ) | |
| General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: KEITH, BATCHELDER, and MOORE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Petitioners Alpha Diallo and Aissatou Diallo, husband and wife, appeal the decision of the Board of Immigration Appeals ("BIA"), which summarily affirmed the Immigration Judge's ("IJ") denial of Mr. Diallo's asylum application and request for withholding of removal. On appeal, Mr. and Mrs. Diallo argue that we should reverse or, alternatively, remand the BIA's decision because the IJ applied the incorrect legal standard for analyzing Mr. Diallo's alleged fear of future persecution. Finding that the IJ incorrectly articulated the standard for a future persecution claim, we **VACATE** the decision of the BIA and **REMAND** this matter for further proceedings consistent with this opinion.

**I.**

Mr. and Mrs. Diallo are citizens of Guinea. Mr. Diallo worked as a marine engineer for Guinomar — a company owned 51% by the Guinean government and 49% by a Norwegian

company. His job required him to alternate between sea voyages lasting two to six months and "vacation" periods lasting four months. His numerous voyages took him all over the world, stopping at ports throughout the United States, South America, Asia, and Europe. Mr. Diallo was also an active participant in the opposition political party known as the Party of Renewal and Progress ("PRP"), which later changed its name to the Union for Progress and Renewal ("UPR"). Although Mr. Diallo did not hold an office in the UPR, he was regularly involved in party meetings, community education, and campaign activities.

During the 1995 election, Mr. Diallo's father was a candidate for political office in Koundara, Guinea. Mr. Diallo received mission orders from the UPR to campaign on his father's behalf. Just prior to the election, Mr. Diallo learned that UPR party members were not receiving their voting cards, which effectively precluded them from voting in the election, and he sought assistance from the government representative in Koundara. An argument erupted during Mr. Diallo's meeting with the government official. The government official called the police, told them that Mr. Diallo threatened to kill him, and requested that Mr. Diallo be arrested. Mr. Diallo was taken to prison where he was detained and questioned for seventy-two hours. During this time, Mr. Diallo was ordered to disrobe, thrown into a dark cell with other inmates, interrogated about his political involvement, beaten on his bare buttocks with a belt, and left to stand naked or partially naked for an hour in an area visible to others.

During the 1998 election, Mr. Diallo again obtained mission orders to campaign for the party. This time he engaged in campaigning activities without any adverse treatment by the government. In February 2000, after Mr. Diallo had returned home from a long voyage at sea and resumed his political activities, an unidentified group of approximately ten armed men invaded his home in

Conakry, Guinea. The men asked to speak with Mr. Diallo and demanded money and other valuables. While Mr. Diallo hid under a car in the garage, Mrs. Diallo took the men to the closet where the family kept its money. As the men were loading money into their bags, Mr. Diallo's neighbors came to the rescue, killing two of the men and scaring away the rest.

Overwhelmed with fear, Mrs. Diallo immediately took her children to stay with her mother in Gambia, but because her stepfather did not want Mrs. Diallo living with him, Mrs. Diallo soon left her mother's residence and obtained a temporary visa to travel to the United States in January 2001. Prior to leaving for the United States, Mrs. Diallo sent her children to live with Mr. Diallo's mother in Koundara, where they remain to this day. In July 2002, Mr. Diallo visited his wife in New York and tried in vain to convince her to return to Guinea. After this unsuccessful effort, Mr. Diallo returned to Guinea alone. On May 10, 2003, Mr. Diallo again heard a group of men trying to invade his home. Before the men could get inside, Mr. Diallo's neighbors began shouting, honking their car horns, and firing warning shots — all of which caused the intruders to flee. Mr. Diallo remained in Guinea for two months following this incident before obtaining a temporary visa to travel to the United States in July 2003.

On March 25, 2004, the government issued a notice to appear against Mr. and Mrs. Diallo because they had exceeded the terms of their respective temporary visas and were removable under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*. Mr. and Mrs. Diallo conceded removability, but Mr. Diallo filed an application for asylum and withholding of removal on the basis of political persecution, in which he sought protection for Mrs. Diallo as his wife. *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse . . . of an alien who is granted asylum under this subsection may . . . be granted the same status as the alien if accompanying, or following to join, such alien"). After a

hearing on this matter, the IJ denied Mr. Diallo's application, concluding that, even though Mr. Diallo was credible, he did not establish past persecution or demonstrate a well-founded fear of future persecution. The IJ reviewed three incidents — the 1995 detention, the 2000 home invasion, and the 2003 attempted home invasion — as bases for Mr. Diallo's asylum request. The IJ first considered whether the 1995 detention amounted to past persecution and stated, in one sentence without any supporting analysis, that "this brief incarceration [did] not constitute past persecution." The IJ next assessed whether the 1995 detention gave rise to a well-founded fear of future persecution, concluding that such fear, even if based on his political opinion, was not "subjectively reasonable." The IJ then concluded that Mr. Diallo failed to establish that the 2000 or 2003 home invasions were related to his political activities, concluding it was just as likely that Mr. Diallo, as a prosperous citizen, was the victim of a violent burglary. The BIA affirmed the IJ's decision without opinion, and Mr. Diallo filed a petition for review to this court.

## II.

"When the [BIA] adopts the decision of the IJ in lieu of issuing its own opinion, we review the IJ's decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003); *see also* 8 C.F.R. § 1003.1(e)(4)(ii). An alien qualifies as a refugee for purposes of asylum if he is unable or unwilling to return to his homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). "In order to demonstrate that he qualifies as a refugee, an alien must establish either that he has suffered actual past persecution or that he has a well-founded fear of future persecution." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citing 8 C.F.R. § 208.13(b)).

On appeal, Mr. Diallo argues that the IJ applied an improper legal standard when evaluating whether his 1995 detention demonstrated a well-founded fear of future persecution. We will vacate and remand the IJ's decision if he applied an incorrect legal standard. *See Grijalva v. Gonzales*, 212 F. App'x 541, 551 (6th Cir. 2007) (unpublished case).

In finding no well-founded fear of future prosecution, the IJ stated:

> To the extent that [Mr. Diallo] bases a claim for asylum on [his 1995 detention], he must demonstrate that any fear that he has is both objectively and subjectively reasonable. It is not *subjectively reasonable* for [an asylum applicant] to fear this incident, as the basis of a claim, when he left Guinea shortly thereafter as a seaman and returned to Guinea numerous times, between 1995 and 2003. This indicates that [Mr. Diallo's] fear is not *subjectively reasonable*, even if it is based on his political opinion.

"A well-founded fear of persecution . . . has both a subjective and an objective component[.]" *Pilica*, 388 F.3d at 950. The subjective component of a well-founded fear of future persecution requires that the applicant "must actually fear that he will be persecuted upon return to his country[.]" *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994). The objective component, on the other hand, requires that the applicant must "establish[] an 'objective situation' under which his fear can be deemed reasonable." *Pilica*, 388 F.3d at 950. Thus, the subjective component asks only whether the applicant's fear is genuine (i.e., whether he actually fears future persecution), and the objective component evaluates whether the applicant's fear is reasonable. *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) ("The fear of persecution must be both subjectively genuine and objectively reasonable.").

By speaking in terms of "subjective reasonableness," the IJ improperly conflated these two separate inquiries. We suspect that the IJ may have simply misspoken during the dictation of his decision, and that he was actually analyzing whether Mr. Diallo's fear was "objectively reasonable,"

5

which is the proper inquiry under the objective prong. *See id.* The IJ had already concluded that Mr. Diallo was credible, and it would be illogical, after finding Mr. Diallo credible, for the IJ to question the genuineness of his subjective fear. *See Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005) ("The subjective fear component turns largely upon the applicant's own testimony and credibility."). But because we cannot be sure whether the IJ applied an improper standard or whether he merely incorrectly stated the proper standard, we think the appropriate course is to remand the case and give the IJ an opportunity to articulate and apply the proper legal standard to the claim of future persecution.

We have some concern as well about the IJ's failure to provide any analysis of whether Mr. Diallo's 1995 detention amounted to past persecution. "[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (alteration in original); *see also Mikhailevitch v. INS*, 146 F.3d 384, 389-90 (6th Cir. 1998). Mr. Diallo testified that he was arrested after a political squabble, detained for three days, ordered to disrobe, interrogated about his political associations, beaten with a belt, and left to stand naked or partially naked for an hour in an area visible to others. In issuing his decision, the IJ summarily stated in one conclusory sentence that "this brief incarceration [did] not constitute past persecution." Whether Mr. Diallo's detention amounted to past persecution is a close legal question — one that requires at least some analysis from the IJ. While we have affirmed other BIA decisions finding no past persecution where an applicant experienced harsher treatment than that endured by Mr. Diallo, *see, e.g.*, *Mullai v. Ashcroft*, 385 F.3d 635, 637-38 (6th Cir. 2004) (affirming a finding of no past persecution where the petitioner was detained for at least a week and was beaten by the police on four separate occasions); *Mburu v. Gonzales*, 214 F. App'x 505, 508 (6th Cir. 2007)

6

(unpublished case) (affirming a finding of no past persecution where the petitioner was detained for four days, interrogated, and physically assaulted); *Gjokic v. Ashcroft*, 104 F. App'x 501, 505 (6th Cir. 2004) (unpublished case) (affirming a finding of no past persecution where the petitioner was detained and beaten), we have generally had the benefit of the IJ's analysis on the issue.

### III.

For the foregoing reasons, we **VACATE** the decision of the BIA and **REMAND** for further proceedings consistent with this opinion.